IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DENISSE TORRES, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| CAROLYN W. COLVIN, | : | NO.  14 – 0794 |

## REPORT AND RECOMMENDATION

ELIZABETH T. HEY, U.S.M.J.                              December 21, 2015

This action was brought pursuant to 42 U.S.C. § 405(g) to review the final

decision of the Commissioner of Social Security ("Commissioner" or "Defendant"),

denying the application of Denisse Torres ("Plaintiff") for supplemental social security

income ("SSI") under Title XVI of the Social Security Act.  For the reasons that follow, I

conclude that the decision of the Administrative Law Judge ("ALJ") is not supported by

substantial evidence.  Therefore, I recommend that this matter be remanded for further

proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

## I.    PROCEDURAL HISTORY

Plaintiff protectively filed for SSI on April 28, 2011, alleging disability as of

September 22, 2007, as a result of depression, diabetes mellitus, arthritis, and obesity.

Tr. 61, 146, 153.  The application was denied on August 30, 2011, and Plaintiff requested

an administrative hearing on October 25, 2011.  Id. at 63-69.  On September 4, 2012, ALJ

Nancy Lisewski conducted an administrative hearing.  Id. at 32-48.  In a decision dated

September 20, 2012, the ALJ denied Plaintiff's claim.  Id. at 17-26.  On December 27,

2013, the Appeals Council denied Plaintiff's request for review.  Id. at 1-5.  Therefore,

the ALJ's September 20, 2012 decision is the final decision of the Commissioner. 20 C.F.R. § 416.1472.

Plaintiff commenced this action on February 2, 2014, and submitted a Brief and Statement of Issues in Support of Request for Review on April 24, 2014. Docs. 1 & 7. Defendant filed a response, to which Plaintiff filed a reply. Docs. 10 & 11. The Honorable James Knoll Gardner referred the matter to the undersigned for a Report and Recommendation. Doc. 12.

## II.   <u>LEGAL STANDARD</u>

The court's role on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence. 41 U.S.C. §§ 405 (g), 1383(c)(3); <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Hartranft v. Apfel</u>, 181 F.3d 358, 360 (3d Cir. 1999). Therefore the issue in this case is whether there is substantial evidence to support the Commissioner's conclusion that Plaintiff is not disabled. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate," and must be "more than a mere scintilla." <u>Zirnsak v. Colvin</u>, 777 F.2d 607, 610 (3d Cir. 2014) (quoting <u>Rutherford v. Barnhart</u>, 399 F.3d 546, 552 (3d Cir. 2005)). The court has plenary review of legal issues. <u>Schaudeck v. Comm'r of Soc. Sec.</u>, 181 F.3d 439, 431 (3d Cir. 1999) (citing 42 U.S.C. § 405(g)).

To prove disability, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for . . . not less than twelve

months." 42 U.S.C. § 423(d)(1).  The Commissioner employs a five-step process, evaluating:

1. Whether the claimant is currently engaged in substantially gainful activity;

2. If not, whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to perform basic work activities;

3. If so, whether, based on medical evidence, the impairment meets or equals the criteria of an impairment meets or equals the criteria of an impairment listed in the "listing of impairments," 20 C.F.R. pt. 404, subpt. P, app. 1, which results in a presumption of disability;

4. If the impairment does not meet or equal the criteria for a listen impairment, whether, despite the severe impairment, the claimant has the residual functional capacity ("RFC") to perform her past work; and

5. If the claimant cannot perform her past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

See Zirnsak, 777 F.3d at 610; see also 20 C.F.R. § 416.920a(4).  Plaintiff bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at the fifth step to establish that the claimant is capable of performing other jobs in the local and national economies, in light of her age, education, work experience, and residual functional capacity.  Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 92 (3d Cir. 2007).

## III.   FACT RECORD AND THE ALJ'S DECISION

Plaintiff was born on May 12, 1979, and thus was 28 years of age at the time of the alleged onset of her disability, 32 years at the time of her administrative hearings, and 33 years of age at the time of the ALJ decision under review.  Tr. at 49, 153.  Plaintiff is a

high school graduate, having attended school in Puerto Rico, and did not study English in the United States or while living in Puerto Rico.  Id. at 34.[1]  Plaintiff is five feet, three inches tall and weighs approximately 283 to 293 pounds.  Id. at 34, 55.  At the time of her administrative hearing, Plaintiff resided with her husband and two children, ages thirteen and four, and received help taking care of her children from her husband and mother.  Id. at 34, 40-41.  Plaintiff indicated that she stopped working on August 31, 2005, but the ALJ found that Plaintiff's earnings records show no clear substantial gainful activity and that she has no past relevant work.  Id. at 25, 44, 146-47.

### A.   Medical Evidence[2]

Plaintiff has a treatment history for both mental and physical problems.  The record contains evaluations and treatment notes from Pan-American Mental Health Services dated November 15, 2003, through July 8, 2011, during which she treated with Michael Bien-Aime, M.D.  Tr. at 201-52.[3]  During this period Plaintiff's diagnoses

---

[1]The record contains conflicting evidence regarding Plaintiff's English language proficiency, with some sources characterizing her as fluent in English.  I note that the ALJ had an interpreter "in reserve" for Plaintiff's administrative hearing, but that the interpreter was not utilized.  Tr. at 33.

[2]As previously noted, Plaintiff filed her SSI application on April 28, 2011, and therefore that is the relevant date for purposes of the disability determination.  See 20 C.F.R. § 416.335 ("[T]he earliest month for which we can pay you [SSI] benefits is the month following the month you filed the application.  If you file an application after the month you first meet all the other requirements for eligibility, we cannot pay you for the month in which your application is filed or any months before that month.").

[3]Dr. Bien-Amie's treatment notes include reference to Plaintiff's hospitalization after a suicide attempt in 2002.  Tr. at 247.  Elsewhere, Plaintiff stated that she was hospitalized for three days after cutting her wrists.  Id. at 290.

4

remained consistent, but her overall assessment fluctuated depending on her stressors and medication compliance.  For example, on November 15, 2003, Dr. Bien-Aime diagnosed Plaintiff with major depressive disorder ("MDD"),[4] severe, with psychotic features, and obesity, and assessed her with a Global Assessment of Functioning ("GAF") score of 40. Id. at 246.[5]  The doctor prescribed medication, including Abilify.  Id.[6]  On March 5, 2005, Dr. Bien-Aime noted that Plaintiff's depressive symptoms "have greatly abated," and he diagnosed Plaintiff with MDD, chronic, in partial remission, and obesity, and assessed her with a GAF score of 65.  Id. at 242, 243.[7]  Plaintiff's medications at that

---

[4]Major Depressive Disorder is a disorder that features one or more Major Depressive episodes without a history of manic, mixed, or hypomanic episodes. Diagnostic and Statistical Manual of Mental Disorders, 4th ed. Text Revision (2000) ("DSM IV-TR"), at 369.  Although DSM IV-TR has been replaced by the DSM V, I will utilize the diagnostic manual in use during the relevant time.

[5]The GAF score is a measurement of a person's overall psychological, social, and occupational functioning, and is used to assess mental health.  DSM IV-TR at 34.  A GAF score between 31 and 40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant), OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood . . . ."  Id.

[6]Abilify (aripoprazole) is an antipsychotic medication used together with other medications to treat MDD in adults.  See http://www.drugs.com/abilify.html (last visited Dec. 10, 2015).

[7]A GAF score between 61 and 70 indicates "Some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships).  DSM IV-TR at 34.

time included Lexapro.  Id.[8]  On March 28, 2008, Plaintiff reported that she had been

recently depressed following the birth of her six-month old baby, and that she had not

been compliant with her medication.  Id. at 247.  The doctor diagnosed Plaintiff with

MDD, recurrent, moderate, as well as diabetes and obesity, noted that being a single

mother was a significant stressor, and assessed her with a GAF score of 55.  Id. at 248.[9]

The doctor prescribed Prozac.[10]  On June 19, 2009, Dr. Bien-Aime noted that Plaintiff

obtained "fairly good results" on Prozac, but that she remained depressed and had "severe

stressors" such as her husband's recent deportation to Nicaragua.  Id. at 249-50.[11]  The

doctor assessed her with a GAF score of 45 and opined that Plaintiff needed "ongoing

long term psychiatric care."  Id. at 250.[12]  As of May 6, 2011, Plaintiff listed her

---

[8]Lexapro (escitalopram) is an antidepressant used to treat anxiety and/or MDD in adults.  See http://www.drugs.com/lexapro.html (last visited Dec. 10, 2015).

[9]A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  DSM IV-TR at 34.

[10]Prozac (fluoxetine) is an antidepressant used to treat MDD and panic disorder, among other things.  See http://www.drugs.com/prozac.html (last visited Dec. 10, 2015).

[11]The references to this man are not consistent in the record.  In January 2009, Plaintiff reported that her boyfriend went back to his native Honduras a few months ago and was not allowed to return, and in June 2011, she reported that a few years ago she was in a stable relationship with a man but that he was deported to Honduras.  Tr. at 203, 289.  In any event, Plaintiff married another man with whom she lived at the time of her administrative hearing.  Id. at 40-41, 43.

[12]A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  DSM IV-TR at 34.

medications as Effexor, Klonopin, and Desyrel.[13]  Id. at 290.  Dr. Bien-Aime also signed

multiple Department of Public Welfare ("DPW") forms dated from September 22, 2007,

through April 15, 2011, indicating that Plaintiff was either "temporarily disabled" or

"permanently disabled."  Id. at 277-85.

On June 3, 2011, James Wrable, Ph.D., conducted a psychological evaluation of

Plaintiff.  Tr. at 286-96.[14]  Dr. Wrable noted Plaintiff's history of sexual abuse by her

brother-in-law (beginning at about age 13), and rape and emotional abuse from her first

child's father, as well as other stressors including family members' drug use, violence,

and her first child's own mental problems.  Id. at 287-89.  She reported having a

generalized fear of others, especially men, but stated that she had moved to Philadelphia

and lived with an aunt who is "very close and supportive."  Id. at 289-90.  Plaintiff

explained that her aunt talked her into getting psychiatric treatment beginning in 2003,

and that since mental health treatment began she "has been able to do more in the home

and that her anxiety has decreased overall," but that she remains "sad and down on a

daily basis and still has nightmares of men raping her."  Id. at 290.

Physically, Plaintiff stated that she has diabetes, is overweight, and takes over-the-

counter pain medication for arthritis, and that she needs a liver test but "fears what they

---

[13]Effexor (venlafaxine) an antidepressant used for the treatment of major
depressive disorder, anxiety, and panic disorder.  See http://www.drugs.com/effexor.html
(last visited Dec. 10, 2015).  Klonopin (clonazepam) is used for the treatment of seizure
disorders and panic disorders.  See http://www.drugs.com/klonopin.html (last visited
Dec. 10, 2015).  Desyrel (trazodone) is an anti-depressant used to treat major depressive
disorder.  See http://www.drugs.com/mtm/desyrel.html (last visited Dec. 10, 2015).

[14]Plaintiff states that she was sent to Dr. Wrable in connection with the DPW's
Maximizing Participation Project (i.e., welfare to work).  See Doc. 7 at 6-7.

might find." Id. at 291.  She typically spends the day around her home caring for her three-year old daughter, and is "generally able to cook and clean and, along with her aunt, handle her finances." Id.  Dr. Wrable observed that Plaintiff arrived by cab to the appointment, ambulated up one flight of stairs slowly and without complaint, acted cordial to people she encountered, exhibited a fairly broad range of affect with good eye contact, and dressed appropriately and was well groomed. Id. at 292.  She denied any psychotic symptoms or panic attacks at present, but stated that she continues to have "passive suicidal ideation." Id. at 292-93.  Upon testing, Dr. Wrable found that Plaintiff performed in the intellectually impaired level corresponding to an IQ score below 75, and that she functioned at the third and sixth grade levels, respectively, in reading and arithmetic. Id. at 293-95.  The doctor diagnosed Plaintiff with MDD, recurrent, severe; Post-Traumatic Stress Disorder ("PTSD"), chronic; and borderline intellectual functioning. Id. at 293, 296.[15]  Dr. Wrable assessed Plaintiff with a GAF score of 48. Id. at 296.

Also on June 3, 2011, Dr. Wrable completed a Medical Assessment of Ability to Do Work-Related Activities (Mental). Tr. at 297-99.  In the category of occupational adjustments, the doctor opined that Plaintiff had fair ability to follow work rules; poor ability to relate to co-workers, deal with the public, use judgment, deal with work

---

[15]The essential feature of PTSD is the development of characteristic symptoms following exposure to an extreme traumatic stressor, the response to which must involve intense fear, helplessness, or horror, and which is characterized by, among other things, persistent re-experiencing of the traumatic event and/or persistent avoidance of stimuli associated with the event. DSM IV-TR at 463.  Borderline intellectual functioning is an IQ in the 71-84 range. Id. at 740.

stresses, function independently, and maintain attention and concentration; and no ability to interact with supervisors. Id. at 297.  In the category of performance adjustments, the doctor opined that Plaintiff had a fair ability to understand, remember and carry out simple instructions, and poor ability to understand, remember and carry out complex or detailed, but not complex, instructions. Id. at 298.  In the category of personal-social adjustments, Dr. Wrable noted that Plaintiff had fair ability to maintain personal appearance, relate predictably in social situations, and demonstrate reliability, and that she also had fair ability to behave in an emotionally stable manner "in low stress." Id.  In addition, the doctor opined that Plaintiff is likely to decompensate in a work setting due to stress, is likely to miss three or more days of work per month due to psychological symptoms or difficulties, and would be expected to often or frequently experience deficiencies in concentration, persistence and pace. Id. at 298-99.

On August 12, 2011, Horacio Buschiazzo, M.D., performed a physical examination on Plaintiff. Tr. at 253-56.  Dr. Buschiazzo noted Plaintiff's history of diabetes, noting that she was non-compliant with a diabetic diet and had no symptoms of diabetic neuropathy. Id. at 253.  Plaintiff complained of bilateral pain in her knees that began spontaneously seven years previously, and described pain upon walking more than three blocks, difficulty climbing steps, and inability to kneel. Id. at 253-54.  She reported that she had an MRI performed in the past, but due to language barriers, could not understand the results. Id. at 253.  Upon examination, Plaintiff exhibited full range of motion of her upper extremities, and normal range of motion in both hips, knees and ankles, with some limitations on range of motion caused by her obesity, no effusion or

crepitus,[16] and no instability, edema or varicosities.  Id. at 255.  The doctor observed

Plaintiff leave the office and walk for approximately 100 feet, during which she

ambulated unassisted and at a normal pace with a wide-based gait due to obesity.  Id.  Dr.

Buschiazzo listed Plaintiff's medications as diabetic insulin, as well as Januvia, Actoplus,

venlafaxine, Klonopin and Trazodone.  Id. at 254.[17]  The doctor's final impressions were

insulin-dependent diabetes, uncontrolled, possible degenerative arthritis of the knees (for

which the earlier MRI or new x-rays would be needed to verify), reactive anxiety

depression, and morbid obesity.  Id. at 256.[18]

    Also on August 12, 2011, Dr. Buschiazzo completed a Medical Source Statement

of Claimant's Ability to Perform Work-Related Physical Activities for Plaintiff.  Tr. at

257-58.  Dr. Buschiazzo opined that Plaintiff could stand and walk for one hour in an

eight-hour day, noting that she could only walk three blocks before experiencing knee

pain.[19]  Id. at 257.  The doctor opined that Plaintiff had no limitations in lifting, sitting, or

---

[16]Crepitus in the joints is defined as the grating sensation caused by the rubbing together of the dry surfaces of joints.  Dorland's Illustrated Medical Dictionary, 32nd ed. (2012) ("DIMD"), at 429.

[17]Januvia (sitagliptin) is used for treatment of diabetes. http://www.drugs.com/januvia.html (last visited Dec. 10, 2015).  Actoplus, or Actoplus Met (metformin and pioglitazone), is also used for treatment of diabetes. http://www.drugs.com/actoplus_met.html (last visited Dec. 10, 2015).

[18]As will be discussed later in the Report, a summary of the 2008 MRI is contained in the record as part of Plaintiff's treatment records from June 2012.  See tr. at 440.

[19]Dr. Buschiazzo did not indicate whether Plaintiff had any limitation in carrying. Tr. at 257.

pushing and pulling; could occasionally kneel and climb; could frequently bend, stop, crouch, and balance; and had no other physical or environmental restrictions. Id. at 257-58.

On August 30, 2011, State agency medical and mental specialists generated a Disability Determination Explanation related to Plaintiff's SSI application. Tr. at 49-60.[20] In the Psychiatric Review Technique ("PRT") portion of the determination, Dr. Vizza indicated that a medically determinable impairment is present (specifically, 12.04 Affective Disorders), and opined that Plaintiff had "moderate" restrictions in activities of daily living, maintaining social functioning, and maintaining concentration, persistence or pace, and had no repeated episodes of decompensation. Id. at 52, 56-57. Dr. Vizza found Plaintiff's statements to be partially credible, and concluded that the limitations resulting from her mental impairment do not preclude Plaintiff from performing the basic mental demands of competitive work. Id. at 58. In the physical portion of the determination, Dr. Kamenar opined that Plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently, could stand and/or walk six hours in an eight-hour day, could sit (with normal breaks) for six hours in an eight-hour workday, and had unlimited ability to push/pull. Id. at 54. Dr. Kamenar further opined that Plaintiff could occasionally climb, balance, stoop, kneel and crouch, and should avoid concentrated exposure to extreme head and cold, humidity, vibration and hazards. Id. at 54-55.

---

[20]Although the determination is electronically signed by Joseph P. Coccia, SDM, see tr. at 59, 60, the mental health portions of the determination were completed by James Vizza, Psy.D., and the physical health portions were completed by Elizabeth Kamenar, M.D. Id. at 53, 56.

On September 29, 2011, on Plaintiff's self-referral, Aura López, M.A., a therapist at Northeast Community Mental Health Center, Inc. ("Northeast"), completed a Biopsychosocial Evaluation of Plaintiff.  Tr. at 332-46.  Plaintiff described herself as depressed, with a poor self-image and difficulty sleeping or concentrating.  Id. at 333, 45.  She denied having current family stressors or problems, stating that she "has [a] good relationship" with her spouse and children with whom she resides; and she denied any neighborhood or community involvement, stating she has difficulty with new people "because I'm very shy," but acknowledged attending and participating in church.  Id. at 342, 344.  Ms. López diagnosed Plaintiff with MDD, recurrent, and diabetes, identified "social issues" as a problem area, and assessed her with a GAF score of 55.  Id. at 346.  On the same day, Northeast psychiatrist John Reitano, M.D., described Plaintiff as casual and cooperative, evaluated her as fully oriented with normal speech rhythm, described her affect and mood as depressed, and noted that she experienced flashbacks of sexual abuse.  Id. at 347-49.  Dr. Reitano noted the same diagnoses, described Plaintiff as isolated, and assessed her with a GAF score of 55.  Id. at 349.

Plaintiff continued to receive mental health treatment at Northeast through July 2012, primarily conducted by Ms. López and Dr. Reitano.  Tr. at 352-96.  As of July 19, 2012, Plaintiff continued to feel depressed and anxious, stating "I try to get support [for] my daughter, but it is difficult for me."  Id. at 351.  Ms. López noted that Plaintiff was fully oriented, was appropriately dressed and groomed, had an appropriate affect and coherent speech, and that she did not report psychotic or suicidal/homicidal ideation.  Id.

12

Lastly, the record contains treatment records for Plaintiff's physical issues in 2012, primarily involving complaints of ankle, foot and knee pain. Tr. at 399-441. On April 23, 2012, Plaintiff underwent a radiological study of both feet in response to complaints of pain. Tr. at 436. The report indicated no acute fractures or dislocations and unremarkable adjacent soft tissue, but noted the presence of bilateral calcaneal spurs. Id. [21] On June 11, 2012, Plaintiff sought treatment for ongoing complaints of knee pain. Id. at 437-41. Plaintiff ambulated with no difficulty and no assistive device, and she exhibited no effusion. Id. at 439. Upon examination, Plaintiff had a positive patella grind with crepitus on active range of motion, and review of an MRI taken of her left knee on September 17, 2008, showed a probable parameniscal cyst and possible meniscus tear, among other things. Id. at 439-40. The attending physician's impressions were diabetes mellitus and patellofemoral syndrome ("PFS"). Id. at 440.[22] Meanwhile, in June and July 2012, Plaintiff attended physical therapy for foot pain caused by plantar fasciitis. Id. at 399-424.[23]

### B.   Hearing Testimony and Other Evidence

---

[21]Spurs are defined as pointed projections on the surface of bones, which if located on the plantar surface of the foot can either be benign or "cause severe pain when a person walks." DIMD at 1757.

[22]PFS is a pain syndrome associated with the front of the knee, which is sometimes caused by the wearing down, roughening, or softening of the cartilage under the kneecap. See http://www.webmd.com/pain-management/knee-pain/tc/patellofemoral-pain-syndrome-topic-overview (last visited Dec. 10, 2015).

[23]Plantar fasciitis refers to inflammation of the sheet of fibrous tissue over the planta, the undersurface of the foot. DIMD at 679, 684, 1455.

At her administrative hearing, Plaintiff testified that she experiences pain in her foot due to bone spurs which prevent her from doing things around the house, as well as pain in her knees due to being overweight. <u>Tr.</u> at 35. Plaintiff's doctors have instructed her to lose weight, but she has difficulty doing so because her depression and anxiety lead her to eat in excess. <u>Id.</u> at 36. Plaintiff testified that she had injections to manage her heel pain, which did not help, and that she wears an ankle brace which contains an "air bag" for her ankle. <u>Id.</u> at 37. Plaintiff stated her knees and feet swell, and that she elevates her legs on top of a pillow to alleviate the swelling. <u>Id.</u>

Plaintiff testified that she has received long-term mental health treatment for problems which originated due to sexual abuse first from her sister's husband starting when she was twelve years of age, and then abuse from her own first husband. <u>Tr.</u> at 39. The depression causes her to not want to be around a lot of people and to want to stay in her house and in her room. <u>Id.</u>

Plaintiff lives in a home with her husband and children aged thirteen and four, who she takes care of with the help of her husband and mother. <u>Tr.</u> at 40-41, 43. She can perform chores, but she can only stand for approximately twenty minutes and she must sit down and rest because of knee or heel pain. <u>Id.</u> at 41. She further testified that she can only sit for approximately thirty minutes before her knees and feet swell up, and if she carries anything heavy her knees begin to hurt. <u>Id.</u> at 42. Plaintiff testified she cannot carry her 36-pound daughter, and that she performs approximately fifteen hours of chores per week. <u>Id.</u> at 42-43.

14

The ALJ also obtained testimony from a Vocational Expert ("VE").  Tr. at 43-47.
The ALJ asked the VE to consider a hypothetical person of Plaintiff's age, education, and
work background who is limited to light work, occasional postural activities, who should
not be exposed to temperature extremes, vibration, or hazards, and is limited to simple
unskilled work with limited social interaction.  Id. at 44.  The VE testified that this
hypothetical person could perform jobs such a a packer, house cleaner, or assembly
positions.  Id.  The ALJ then asked the VE to assume the same individual, but who would
be off task at least twenty-five percent of the day.  Id. at 45.  In this hypothetical, the VE
testified there would be no work available.  Id.

In response to a question from Plaintiff's counsel, the VE testified that the
hypothetical person could not perform any of the identified jobs if she had "no useful
ability to deal with work stresses."  Tr. at 45.  The VE confirmed that once the training
period for each job was completed, the worker would be expected to know how to do the
job and to complete tasks from beginning to end with consistency.  Id. at 46.  The VE
stated that two absences per month would be tolerable before a job becomes
noncompetitive.  Id.

C.    **ALJ's Opinion**

In a decision dated September 20, 2012, the ALJ found as follows:

1.    At step one, the ALJ found that Plaintiff has not engaged in
substantial gainful activity since the application date, April 28, 2011.
Tr. at 19.

15

2.      At step two, the ALJ found that Plaintiff has the following severe impairments: a mood disorder, diabetes, patellofemoral syndrome, plantar fasciitis, and obesity.  Id.

3.      At step three, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Id.

4.      The ALJ determined that Plaintiff retains the RFC to perform a range of light work except she is limited to only occasional postural activities; she cannot be exposed to extreme temperatures, vibration and hazards; and she is limited to simple, unskilled work with only occasional social interaction.  Id. at 21-22.

5.      At step four, the ALJ found that Plaintiff has no past relevant work. Id. at 25.

6.      At step five, the ALJ found that, given Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that she can perform.  Id.

Accordingly, the ALJ concluded that Plaintiff has not been under a disability.  Id. at 26.

In her request for review, Plaintiff argues that the ALJ's decision is not supported by substantial evidence because the ALJ (1) improperly evaluated the medical evidence, (2) failed to assess the severity of Plaintiff's PTSD and/or borderline intellectual functioning impairments, (3) improperly assessed evidence of Plaintiff's physical limitations in formulating the RFC, and (4) erroneously relied on the VE's testimony at step five.  In response, Defendant argues that the ALJ decision is supported by substantial evidence.

## IV.   DISCUSSION

### A.     Claims One and Three: Evaluation of the Evidence

16

In her first claim, Plaintiff argues that the ALJ impermissibly substituted her lay opinions for those of examining psychologist Dr. Wrable, whose opinions the ALJ allegedly rejected for the wrong reasons.  Doc. 7 at 6-17.  In her third claim, Plaintiff argues that the ALJ failed to give proper weight to the opinion of Dr. Buschiazzo in formulating Plaintiff's RFC.  Id. at 19-26.  As both claims involve the ALJ's consideration of the opinion evidence in formulating Plaintiff's RFC, I will address them together.

RFC is defined as "the most [an individual] can still do despite [her] limitations." 20 C.F.R. § 416.945(a)(1).  More specifically, an RFC assessment determines "what an individual can do in a work setting in spite of the functional limitations and environmental restrictions imposed by all of his or her medically determinable impairment(s)."  SSR 83-10, 1983 WL 31251, at *7.

In assessing a claimant's RFC, a treating physician's opinion is entitled to be given greater weight that that of a physician who conducted a one-time examination of the claimant as a consultant.  See, e.g., Adorno v. Shalala, 40 F.3d 43, 47-48 (3d Cir. 1994) (citing Mason v. Shalala, 994 F.2d 1058, 1067 (3d. Cir. 1993)).  Similarly, "the opinions of a doctor who has never examined a patient 'have less probative force as a general matter, than they would have had if the doctor had treated or examined him.'" Morales v. Apfel, 225 F.3d 310, 320 (3d Cir. 2000) (citation omitted).  When there is a conflict in the evidence, the ALJ may choose which evidence to credit and which evidence not to credit, so long as he does not "reject evidence for no reason or for the wrong reason." Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005).  Also, a

physician's statement that a Plaintiff is "disabled" or "unable to work" is not dispositive. Adorno, 40 F.2d at 47-48. Rather than blindly accept a medical opinion, the ALJ is required to review all the medical findings and other evidence and "weigh the relative worth of [the] treating physician's report." Adorno, 40 F.3d at 48. Also, the ALJ must also consider the findings of state agency medical and psychological consultants who are considered "highly qualified" experts in social security disability evaluation. 20 C.F.R. § 416.927(f)(2)(I).

The ALJ discussed the opinion evidence as follows:

> I give great weight to the opinion of the State agency medical consultant. [Dr. Kamenar's] findings regarding the physical limitations resulting from [Plaintiff's] physical impairments are supported by the medical evidence of record. I make the same findings in the [RFC determination].

> [Dr. Vizza's] opinion indicat[ing] that [Plaintiff] has "moderate" functional limitations in the "paragraph B" criteria, is not supported by the evidence of record. The doctor references a medical note indicating that [Plaintiff] "can generally clean and cook," and that she "can perform the personal care functions needed to maintain an acceptable level of personal hygiene," which would support no more than "mild" functional limitations for activities of daily living. With respect to the functional limitations for maintaining social functioning, I generally agree with the limitations and have accounted for those in my [RFC determination]. However, the doctor's finding of "moderate" for the entire function of maintaining social functioning, is inconsistent with her remarks of "[Plaintiff] is able to maintain socially appropriate behavior."

> [Plaintiff] was seen for a psychological evaluation with Dr. James A. Wrable on June 3, 2011. During the clinical interview, [Plaintiff] reported past abuse from her brother-in-law, and from her first child's father. She reported having a generalized fear of others, especially men, which prompts her

18

to be on the defensive.  She started treatment at Pan American
Center in 2003, and was still in treatment at the time of the
evaluation. She reported that, prior to treatment, she stayed in
her room and did not care for herself.  However, since starting
treatment, she has been able to do more in the home and that
her anxiety decreased overall and her sleep had improved. . . .
The doctor noted that she presented a fairly broad range of
affect and good eye contact throughout the examination.  She
reported some reduction in her depression and improved sleep
with her treatment regimen.  Although she had auditory
hallucinations in the past, they stopped.  [Plaintiff] reported
living with her aunt in Philadelphia and that they are "very
close and supportive."  Since starting her psychological
treatment seven years ago, she has moderated her depression
but not her anxiety which is prominent with flashbacks and
nightmares.  Her diagnoses were [MDD], recurrent, severe,
and [PTSD], chronic.  The doctor opined "fair-to-no" ability
for making occupational adjustments; "poor" ability for
making performance adjustments; and "fair" ability for
making personal-social adjustments.  Given [Plaintiff's] own
reports of improvement with her treatment/medication, and
her reports of having a very close and supportive relationship
with her aunt, her reports of being the primary caregiver for
her young 3-year-old daughter, her ability to participate in the
maintenance of a household, and her ability to handle her
finances, I find that the doctor's opinion is not supported by
the evidence of record and is based on the subjective
statements of [Plaintiff] during a one-time meeting with her.

[Plaintiff] was seen for a physical consultative examination
on August 8, 2011, with Dr. Horacio Buschiazzo.  She
reported diabetes, depression, and arthritis.  She stated that
she was diagnosed with diabetes approximately four years
prior, during and after her pregnancy.  She indicated that she
was not compliant with a diabetic diet, and had no symptoms
of diabetic neuropathy.  She also reported pain in her knees
that started 7 years prior, with no trauma, only of a
spontaneous onset.  She allegedly had an MRI, but did not
understand the findings because of a "language barrier."  She
had not had x-rays since then.  She reported problems with
activities such as climbing the stairs and kneeling.  The
physical examination revealed some range of motion
limitations caused by her body habitus.  Flexion of both knees

19

was 140 degrees, bilaterally. There was no effusion or
crepitus present, and no lateral instability. There was no
peripheral edema or varicosities in her lower extremities. She
ambulated unassisted at a normal pace with a wide-based gait
due to her obesity. The doctor's impressions were insulin-
dependent diabetes – uncontrolled; possibility degenerative
arthritis of the knees (suggests review of past MRI or obtain
new x-ray); morbid obesity; and reactive anxiety depression.
The doctor found limitations for 1 hour or less of
standing/walking in an 8-hour workday, and occasional
bending and climbing. I discount the limitations on
standing/walking as his physical examination of [Plaintiff]
revealed no effusion or crepitus, with the limited range of
motion he found noted to be a result of her obesity and not
from arthritis in her knees, and he had no objective medical
evidence (i.e., current diagnostic tests such as an MRI or x-
rays) on which to base his severe standing/walking
limitations.

There are several DPW employability forms in the file. The
first one, dated January 29, 2008, from Dr. Stanford Bagilian,
indicates that [Plaintiff] will be temporarily disabled from
that date until January 29, 2009, because of her major
depressive disorder. It is not clear who the doctor is, the
relationship he has with [Plaintiff], and the length of time or
type of treatment he provided to [Plaintiff].

There are multiple DPW forms from Dr. Michael Bien[-]
Aime, signed on various dates, and findings of "temporarily
disabled" and "permanently disabled" effective on several
different dates. Based on these inconsistencies, the doctor's
opinion is given little weight.

Aside that neither of the doctors provided a narrative report
with well-reasoned rationale for their findings of "disabled,"
whether "temporarily" or "permanently," deciding on the
issue of disability is one reserved to the Commissioner.

Tr. at 23-25 (record citations omitted).

The ALJ's consideration of the opinion evidence is flawed in several respects. In

rejecting Dr. Wrable's opinions because they were based on Plaintiff's subjective

20

statements made during a one-time examination, the ALJ failed to acknowledge the ample objective evidence obtained by the doctor and detailed in his lengthy psychological evaluation, including the doctor's impression and conclusions derived from a clinical interview of Plaintiff as well as mental status and testing instruments.  Tr. at 286-96. Moreover, Dr. Wrable's conclusions regarding Plaintiff's limitations are substantially similar to those made by Plaintiff's longtime mental health providers, including Dr. Bien-Aime who opined on April 15, 2011, that Plaintiff had been psychiatrically disabled since September 2007.  Id. at 277-79.  They are also consistent with Dr. Vizza's PRT insofar as the State agency mental health specialist opined that Plaintiff has "moderate" functional limitations in the "paragraph B" criteria for affective disorders – an opinion the ALJ also rejected.  Id. at 52, 56-57.

The ALJ also erred in finding that the limitations assessed by Dr. Wrable were inconsistent with the record.  Although Plaintiff's mental health treatment record shows some improvement with treatment, as the ALJ notes, it also shows periods of decline associated with increasing levels of stress in her personal life – stress which occurred in the absence of the added stress which would be inherent in regular 40-hour workweeks. For example, Dr. Wrable assessed Plaintiff with a "fair" ability to behave in an emotionally stable manner, but added the caveat "in low stress."  Tr. at 298.  The doctor also noted that "the pressure or stress from even basic employment would likely quickly take its toll and cause decompensation."  Id.  Contrary to the ALJ's conclusion, the fact that Plaintiff attends church, has supportive family members, and attempts to provide care for her children does not render her mentally capable of work.  See Smith v. Califano,

637 F.2d 965, 971 (3d Cir. 1981) ("Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity.").

With regard to Plaintiff's physical limitations, the ALJ rejected the opinion of consultative examiner Dr. Buschiazzo that Plaintiff was limited to one hour or less of standing/walking in an eight-hour day, and instead adopted the opinion of non-examining consultant Dr. Kamenar that Plaintiff was capable of standing/walking for six hours in an eight-hour day. That is, the ALJ accepted the opinion of a non-examining physician over that of her own consultative examiner, even though both assessments were made in the same month – August 2011 – and even though Dr. Kamenar did not explicitly challenge any of Dr. Buschiazzo's findings. More importantly, the ALJ's stated reasons for rejecting Dr. Buschiazzo's opinion – that his examination of Plaintiff revealed no effusion or crepitus in her knees, that her range of motion difficulties were caused by obesity, and that her complaints of knee pain were not otherwise supported by objective medical evidence – were undermined by the ALJ's own summary of Plaintiff's medical records for the months following the assessments. For example, the ALJ noted that in June 2012, in response to Plaintiff's ongoing reports of pain while climbing stairs and walking, an examination was performed in which Plaintiff had "a positive patella grind with crepitus on active range of motion." Tr. at 22. The ALJ also noted Plaintiff's 2012 treatment for plantar fasciitis, and that she underwent physical therapy for bilateral foot and knee pain from May 2012 through July 2012. Id. at 22. Meanwhile, the ALJ ignored the June 2012 records to the extent they contained a summary of findings from Plaintiff's 2008 MRI showing a probable parameniscal cyst and possible meniscus tear, among

22

other things, even though they are precisely the kind of injuries which would provide
objective evidence for Plaintiff's reported knee pain throughout the relevant period.  Id.
at 439-40.  Lastly, it is notable that although Plaintiff's 2012 treatment records were
acquired by the ALJ and provided the basis for her findings that Plaintiff's plantar
fasciitis and PFS were severe conditions, these records post-date Dr. Buschiazzo's and
Dr. Kamenar's RFC determinations, and they were never reviewed or evaluated by any
expert.[24]

In sum, I find that the ALJ discounted Dr. Wrable's mental RFC, and Dr.
Buschiazzo's physical RFC, for the wrong reasons, see Rutherford, 399 F.3d at 554, and
that the ALJ's opinion is therefore not supported by substantial evidence.  Therefore, I
recommend that this matter be remanded for reconsideration of the entire medical record,
including obtaining new expert opinions regarding the limitations imposed by all of
Plaintiff's mental and physical conditions, and that the ALJ revisit Plaintiff's RFC, if
necessary.

## B.  **Claim Two: Severity Assessment**

Plaintiff also argues that the ALJ's opinion is not supported by substantial
evidence because the ALJ failed to assess the severity of Plaintiff's PTSD and/or
borderline intellectual functioning impairments, both of which were diagnosed by Dr.

---

[24]In her opinion, the ALJ noted Plaintiff's self-reported ability to perform chores
and household maintenance, and characterized her as the "primary caregiver" to her
children, in contrast to before mental health treatment when she "stayed in her room and
did not care for herself."  Tr. at 24.  However, the ALJ ignored or significantly
downplayed evidence that Plaintiff must sit and rest frequently when performing chores,
is unable to complete tasks, and requires help from others, including her husband, mother
and older daughter.  Tr. at 40-43.

Wrable.  Doc. 7 at 18-19.  Defendant counters that Dr. Wrable's diagnosis of PTSD and borderline intellectual functioning is contradicted by Plaintiff's treatment records, in which no other physician had diagnosed either impairment.  Doc. 10 at 6-7.

As previously noted, Dr. Wrable's psychological evaluation of Plaintiff included diagnoses for MDD, recurrent, severe; PTSD, chronic; and borderline intellectual functioning.  Id. at 293, 296.  In her opinion, the ALJ mentioned the PTSD diagnosis, see id. at 24, but did not further discuss it, and she never mentioned Dr. Wrable's diagnosis of borderline intellectual functioning.  While it is true that these diagnoses do not appear elsewhere in the record, the record does appear to substantiate the sexual assaults that were the basis for the PTSD diagnosis, and the diagnosis of borderline intellectual functioning was based on psychological testing.  It was incumbent on the ALJ to acknowledge and consider the diagnoses, and it is for the ALJ, not the Defendant, to explain why such diagnoses were discounted.  Because I previously recommended remand of this matter for further consideration of the entire medical record, I further recommend that, upon remand, these diagnoses be explicitly considered.

### C.   Claim Four: Reliance on VE's Testimony

In her final claim, Plaintiff argues that the ALJ improperly relied on the VE's testimony in making her step five determination that jobs exist in significant numbers in the national economy that Plaintiff can perform.  Doc. 7 at 24-26.  Plaintiff essentially argues that the ALJ presented the VE with a deficient RFC, for the reasons set forth in the preceding claims.  Because I recommend that this matter be remanded for reconsideration

24

of the medical record and Plaintiff's RFC, I do not find it necessary to further address this claim at this time.

**V.**   <u>**CONCLUSION**</u>

The ALJ improperly discounted the opinion evidence of Dr. Wrable regarding Plaintiff's mental RFC, and Dr. Buschiazzo regarding Plaintiff's physical RFC.  On remand, the ALJ should reconsider the entire medical record, including obtaining new expert opinions regarding the limitations imposed by all of Plaintiff's mental and physical conditions, and revisit Plaintiff's RFC, if necessary.

Accordingly, I make the following:

## R E C O M M E N D A T I O N

AND NOW, this 21st day of December 2015, it is RESPECTFULLY RECOMMENDED that the case be remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Report, Judgment be entered REVERSING the decision of the Commissioner of Social Security for the purposes of the remand only, and the relief sought by Plaintiff be GRANTED to the extent that the matter be REMANDED for further proceedings consistent with this adjudication.  The Parties may file objections to this Report and Recommendation.  See Local Civ. Rule 72.1.  Failure to file timely objections may constitute a waiver of any appellate rights.

BY THE COURT:

/s/ELIZABETH T. HEY

_____

ELIZABETH T. HEY
UNITED STATES MAGISTRATE JUDGE

26